AO 91 (Rev. 11/11) Criminal Complaint

AUSA Megan DeMarco (312) 371-5698
AUSA Andrew J. Dixon (312) 371-4231



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: **21 CR 351** |
|---|---|
| v. | |
| ALBERTO FERNANDEZ | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 27, 2021, at Stone Park, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | Knowingly and intentionally possessed with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

This criminal complaint is based upon these facts:

__X__ Continued on the attached sheet.

*Hailey Evans*
HAILEY EVANS
Task Force Officer, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: May 27, 2021

*Judge's signature*

City and state: Chicago, Illinois

GABRIEL A. FUENTES, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, HAILEY EVANS, being duly sworn, state as follows:

1. I am a Task Force Officer with the Drug Enforcement Administration (DEA), and have been so employed for two years. Since approximately March 2019, I have been assigned as a Task Force Officer with DEA Chicago High Intensity Drug Trafficking Agency ("HIDTA") Group 43 located in Chicago, Illinois. My current responsibilities include the investigation of narcotics trafficking offenses. Also, I have been employed by the Village of Lisle Police Department since approximately September 2016, first as a Police Officer and currently as a Detective. As part of my duties as a DEA Task Force Officer, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963.

2. This affidavit is submitted in support of a criminal complaint alleging that ALBERTO FERNANDEZ has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging FERNANDEZ with possession with the intent to distribute a controlled substance containing 500 grams or more of cocaine, a Schedule II Controlled Substance, in

violation of 21 U.S.C. § 841(a)(1), I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging FERNANDEZ with possession of narcotics with intent to distribute in violation of Title 21, United States Code, Section 841(a)(1).

## Facts Supporting Probable Cause

### I. Background

4. Since approximately May 2021, law enforcement has been investigating Alberto "Pajaro" FERNANDEZ for narcotics trafficking offenses.

5. On or about May 20, 2021, law enforcement received information from a confidential source ("CS-3")[1] regarding a possible source of supply for cocaine. Per CS-3's information, CS-3 knows of a subject who goes by the nickname "Pajaro" who sells kilograms of cocaine. CS-3 showed agents Pajaro's Facebook profile from the Facebook application on CS-3's cell phone. The profile included a picture, and the name attached to the profile was Alberto FERNANDEZ. Agents have since

---

[1] CS-3 has criminal convictions for narcotics offenses and arson. Law enforcement arrested CS-3 for a narcotics offense on or about approximately 6 a.m. on May 20, 2021, and CS-3 began cooperating the same day, shortly after CS-3's arrest. CS-3 is currently cooperating in hopes of receiving a more lenient sentence for that offense, although law enforcement has not made CS-3 any promises as to what CS-3's ultimate sentence may be. Law enforcement considers CS-3 to be a reliable source of information. The information CS-3 provided was corroborated by the May 20 controlled buy and other law enforcement investigation.

2

identified "Pajaro" to be Alberto FERNANDEZ.[2] According to CS-3, FERNANDEZ is a kilogram-level cocaine trafficker based out of Stone Park, Illinois and deals largely in the Chicagoland area. CS-3 related that, since 2017, CS-3 has purchased cocaine from FERNANDEZ almost every week. Each time, CS-3 bought anywhere from half a kilogram to three kilograms of cocaine from FERNANDEZ. CS-3 related that FERNANDEZ's cocaine is driven up to Illinois from Texas.

## II. The Controlled Buy on May 20, 2021

6. On or about May 20, 2021, members of DEA HIDTA Group 43 formulated plans to utilize CS-3 to complete a controlled purchase of approximately two ounces of cocaine from FERNANDEZ.

7. At approximately 9:43 a.m. on May 20, 2021, CS-3 sent a WhatsApp[3] message to FERNANDEZ at FERNANDEZ's phone number 708-351-2250 (Subject Phone 1).[4] CS-3 asked, "How are you?"[5]

---

[2] CS-3 identified FERNANDEZ from a known Illinois Driver's License photograph of Alberto FERNANDEZ.

[3] Based on my training and experience, as well as internet research, WhatsApp Messenger is an American messaging service owned by Facebook, Inc. It allows users to send text messages and voice messages, make voice and video calls, and share images, documents, user locations, and other content.

[4] Agents determined that FERNANDEZ was the user of Subject Phone 1 based on CS-3's identification of the user of Subject Phone 1 as the Facebook user "Pajaro" and agents' subsequent identification of Pajaro as FERNANDEZ based on a photo identification.

[5] Reference is made to recorded conversations in this Affidavit. In certain instances, these conversations are summarized, translated, and placed in context. My understanding of these conversations is aided by the contents and context of the conversations, my familiarity with the facts and circumstances of this investigation, my experience as a law enforcement officer, my discussions with other law enforcement officers, the experience of other law enforcement agents and officers in this investigation, and other evidence developed during the course of the investigation. The summaries and translations of recorded conversations herein do not represent finalized transcripts and may not represent

8. Shortly thereafter, at approximately 9:49 a.m., FERNANDEZ replied via WhatsApp message from Subject Phone 1, "How are you? I'm at work. They [narcotics suppliers] told me that they are ready in two days. Let's see if that is true." CS-3 replied, "Fuck. How? Did they need something [what is the delay]?" FERNANDEZ replied, "That he was barely in Texas [the driver wasn't far into the drive from Mexico]." CS-3 asked, "Do you have the cheap kind [cocaine mixed with cutting agents]?" FERNANDEZ answered, "Yes, I have some basketballs [ounces] here." CS-3 replied, "Approximately how many? And how much? I just need something small. I'm dry [out of cocaine]." FERNANDEZ replied, "I can do 5 or 6 [ounces]. The thing is I'm working with another guy. And I can only leave them at 1250 [$1,250 per ounce]."

9. CS-3 then sent FERNANDEZ an audio message via WhatsApp stating, "Listen bro, I need ... It's not for me, It's for my friend. I'll let you know how many he needs. You can't leave it at 12 [you can't sell it to me at $1,200 per ounce]?" FERNANDEZ replied, "If I lower it. It'll be my pay [FERNANDEZ will not make a profit]. It's the one you opened [it's an ounce from the same kilogram of cocaine CS-3 had already purchased from]. It's not bad. It's good [good quality cocaine]." CS-3 replied, "My friend wants three [ounces]. I'll arrive around 12 [12:00 p.m.]. What do you think?" FERNANDEZ messaged, "Shit. I won't make it. I leave at until 6 [6:00 p.m.]."

---

the entire conversation that occurred between the identified individuals. All WhatsApp and covertly recorded communications between the CS and FERNANDEZ were originally in Spanish and have since been translated to English. All communications referenced herein were recorded unless otherwise noted.

10. Between approximately 2:34 p.m. and 4:36 p.m., CS-3 and FERNANDEZ, using Subject Phone 1, communicated via WhatsApp about the upcoming cocaine purchase. FERNANDEZ sent a WhatsApp message to CS-3 stating, "Looks like I'm going to get there earlier bro. Like in an hour." CS-3 replied, "Let me ask him. I had already told him at that time bro." FERNANDEZ replied, "Okay. How ever you see fit. I'm ready at whatever time." CS-3 messaged, "Let me call him [the fictitious customer]." FERNANDEZ replied, "Ok. I am just getting here." CS-3 stated, "Ok I'll let you know when I get there. He just said two [two ounces] bro." FERNANDEZ replied, "That's fine. The other guys are going to take longer. I think that they ran out again." CS-3 asked, "Really? Until when?" FERNANDEZ replied, "Supposedly, it was in the next couple of days and I asked someone else and they said longer. When you get here, I'll tell you about it." CS-3 replied, "Ok bro."

11. At approximately 6:15 p.m., FERNANDEZ, using Subject Phone 1, sent a WhatsApp message to CS-3 stating, "Hey, I'm here already." CS-3 replied, "He's almost here. I'll let you know when he's closer."

12. At approximately 6:24 p.m., surveillance was established in the area of 1735 N. 34th Ave., Stone Park, Illinois. CS-3 had previously identified this location to be FERNANDEZ's residence. CS-3 had been to the residence multiple times before.[6]

---

[6] According to law enforcement records, FERNANDEZ's driver's license reflects that his residence is 1735 N. 34th Ave., Stone Park, Illinois. Further, open-source utility bills reflect that FERNANDEZ resides in the basement unit.

5

13. At approximately the same time, agents met with CS-3 at a predetermined location. At this time, agents searched CS-3 and CS-3's vehicle for any contraband and/or excess money. CS-3 had additional cash, which agents held during the deal and returned to CS-3 after the deal was completed. No contraband was located on CS-3 or inside CS-3's vehicle. Agents provided CS-3 with approximately $2,500. Further, CS-3 was wired with an audio/video recording device and a live-audio transmitting device.[7]

14. At approximately 6:27 p.m., CS-3 sent a WhatsApp message to FERNADNEZ, at Subject Phone 1, stating, "I'll be there in ten minutes." FERNANDEZ replied, "Ok."

15. At approximately 6:35 p.m., agents followed CS-3 in CS-3's vehicle as CS-3 left the brief location. Agents maintained constant surveillance of CS-3 and CS-3's vehicle.

16. At approximately 6:48 p.m., surveillance units observed CS-3's vehicle pull onto FERNANDEZ's block and park on the street in front of 1735 N. 34th Ave. At this time, CS-3 placed a recorded call to FERNANDEZ letting FERNANDEZ know that CS-3 was outside.

17. At approximately 6:49 p.m., surveillance units observed CS-3 exit the vehicle, walk toward 1735 N. 34th Ave., and enter the front door.

18. As heard on the covert recording, FERNANDEZ said, "This doesn't have much [not a full ounce]. It's open." CS-3 responded, "There you go, that one [a

---

[7] The video recording device malfunctioned during the deal with FERNANDEZ, so only audio from the deal was captured.

6

full ounce]. FERNANDEZ replied, "Look." CS-3 replied, "Yes." FERNANDEZ said, "About the parts [kilograms of cocaine]. The guy from over there … (Unintelligible) The guy [source of supply] that has them here … (Unintelligible) they're going to let them through. This week, the guy that usually comes to get the junk [low quality narcotics] … I talked to him. He [source of supply] told me that his boss is stuck, if I had any others. He wants the same ones. The H-H [source of supply]. That one's hard [low quality]. The boss has it stuck and that it will be on his way Thursday or Friday." CS-3 asked, "This week?" FERNANDEZ answered, "And I called him and asked him what's going on. They had told me that it would be this week. That it'll be until Sunday or until next Sunday. They had told me Thursday or Friday. They changed it. They have it [narcotics] but they're storing it. This guy, since two weeks, has not wanted to give it to me. (Unintelligible) … Two blocks away from here and from there they take it. (Unintelligible) Since he's on his way, he should bring another 5 [kilograms of narcotics]. He said that it wasn't necessary. And like that we waited for him but because we did not have a choice." CS-3 replied, "Damn. (Unintelligible)." FERNANDEZ stated, "(Unintelligible) The guy's number [price] remains the same, it's similar. (Unintelligible) The reality is that you guys work (Unintelligible) If you want to bring them." CS-3 replied, "At least to see them." FERNANDEZ replied, "I don't like it when they go back. But he said that's how it is. But I know it's not right. It looks about the same and I know it's okay. So that's how I was asking for it because the other guy, he wants some to. He told me that if I bring him the same ones, five of them, I'll get some … and I'll bring you enough for

7

the five [quantity of narcotics]. He said that he could pay (Unintelligible) but at least he'll try to pay the entire five. I told him I'd let him know as soon as they arrive." CS-3 replied, "Well, let me know." FERNANDEZ replied, "This guy [different source of supply] is going to bring me some [narcotics]. It's not the same but it's similar [not the same source but the narcotics have a similar quality]. I believe it's something in between (Unintelligible) and this one." CS-3's reply was unintelligible. FERNANDEZ stated, "If it arrives, I'll let you know. The number [price] I'm going to leave it the same because I don't think they will lower it. (Unintelligible) From this Sunday until next Sunday (Unintelligible). The price is worth it but it's not how it used to be [quality of narcotics is not the same] (Unintelligible). The guy says it's bad ass but it takes forever for it to arrive. He didn't gain a lot of profit because when he arrived it was still a good price. But it dropped." CS-3 replied, "Well, thank you. (Unintelligible)." FERNANDEZ stated something unintelligibly and CS-3 stated, "Okay, we're set. Let me know if anything."

19. Based on my training and experience and the training and experience of other law enforcement officers involved in the investigation, during this conversation, FERNANDEZ advised CS-3 that FERNANDEZ's narcotics supplier is sending another shipment of narcotics to FERNANDEZ, which should be in around Thursday or Friday of next week, meaning May 27 or 28, 2021. FERNANDEZ related that the price per kilogram of cocaine will be similar to what CS-3 has paid in the past. FERNANDEZ further advised that CS-3 can come and see the narcotics

8

once they arrive. FERNANDEZ further advised CS-3 that FERNANDEZ has another customer who wants to purchase five kilograms of narcotics, and that FERNANDEZ will tell him/her as well when the narcotics arrive. Lastly, FERNANDEZ advised CS-3 that FERNANDEZ has another narcotics supplier who has narcotics for sale, but that the quality is different from that of the primary source of supply.

20. At approximately 6:55 p.m., surveillance units observed CS-3 exit the front door of 1735 N. 34th Ave., get back into the driver's seat of CS-3's vehicle, and depart the block.

21. At approximately the same time, agents followed CS-3's vehicle out of the area and to a predetermined debrief location.

22. At approximately 7:00 p.m., agents met with and debriefed CS-3. CS-3 related the following, not verbatim. CS-3 walked into the front door of 1735 N. 34th Ave., turned slightly to the right, and walked downstairs to FERNANDEZ's basement unit. According to CS-3 and as captured on the video/audio recording device, CS-3 and FERNANDEZ began talking about a shipment of kilograms of cocaine that was supposedly coming to FERNANDEZ. CS-3 related that FERNANDEZ then retrieved two clear plastic baggies knotted at the top containing a white chunky/powdery substance, suspect cocaine. According to CS-3, FERNANDEZ weighed both baggies in front of CS-3 and stated that one was short. CS-3 related that FERNANDEZ then retrieved a different clear plastic baggie knotted at the top containing a white chunky/powdery substance (suspect cocaine),

9

weighed it, then gave both baggies to CS-3. CS-3 gave FERNANDEZ $2,500 in exchange. CS-3 then left the basement unit and returned to CS-3's vehicle.

23. At the same time, agents collected from CS-3 two clear plastic baggies knotted at the top, containing a white chunky/powdery substance, suspect cocaine. Based on agents' training and experience, agents believed the substance to be cocaine because it appeared like, smelled like, and had the texture of cocaine.[8] Agents have since submitted the suspect cocaine sold by FERNANDEZ to the DEA laboratory for chemical testing. Results are pending.

### III. FERNANDEZ's Invitation to Purchase Cocaine on May 26, 2021

24. On or about May 24, 2021, at approximately 8:49 p.m., CS-3 sent a WhatsApp message to FERNANDEZ, at Subject Phone 1, asking, "What's up. Is there any of the new stuff [narcotics] available?" At approximately 9:28 p.m., FERNANDEZ, using Subject Phone 1, replied, "Let me call them [the source of supply] tomorrow." CS-3 replied, "Let me know bro."

25. On or about May 25, 2021, at approximately 9:31 a.m., CS-3 sent a WhatsApp message to FERNANDEZ, at Subject Phone 1, asking, "What's up bro?"

26. At approximately 10:17 a.m., FERNANDEZ replied, using Subject Phone 1, "They [Source of Supply] haven't answered me yet." CS-3 replied, "Don't you think they're just fronting [acting like they have narcotics; putting on a show]?

---

[8] Further, as described herein, it was CS-3's understanding that he believed he was meeting FERNANDEZ to buy cocaine, based on CS-3's years-long history of purchasing cocaine from FERNANDEZ.

It's been two weeks." FERNANDEZ replied, "Maybe. They would've brought them by now." CS-3 replied, "Let me know."

27. At approximately 6:08 p.m., CS-3 had an unrecorded WhatsApp Phone conversation with FERNANDEZ, who was using Subject Phone 1.[9] CS-3 advised agents that during this call FERNANDEZ stated that FERNANDEZ had just obtained cocaine and wanted to show it to CS-3; if CS-3 liked the cocaine, then CS-3 could purchase it from FERNANDEZ. FERNANDEZ advised CS-3 to come over to 1735 N. 34th Ave on May 26, 2021 to look at the narcotics.

IV. **Receipt of a Sample of Cocaine from FERNANDEZ on May 26, 2021**

28. During the course of the day on May 26, 2021, CS-3 exchanged a series of WhatsApp communications with FERNANDEZ regarding a planned narcotics transaction. During these communications, FERNANDEZ advised CS-3 that CS-3 could come over to FERNANDEZ's residence to see a new shipment of cocaine.

29. At approximately 5:11 p.m., agents initiated surveillance of FERNANDEZ's residence. Shortly thereafter, agents met with CS-3 and searched CS-3's person for contraband, with none found. CS-3 was equipped with audio/video recording equipment. CS-3 then travelled from the meet location to the area of FERNANDEZ's residence under constant surveillance.

30. Surveillance observed CS-3 arrive in the area of FERNANDEZ's residence at approximately 5:42 p.m., park CS-3's vehicle, and enter FERNANDEZ's residence.

---

[9] FERNANDEZ called CS-3 unexpectedly and CS-3 was unable to record the phone call at that time.

11

31. At approximately 5:49 p.m., CS-3 exited FERNDANDEZ's residence, reentered CS-3's vehicle, and left the area.

32. Shortly thereafter, CS-3 arrived in a predetermined meet location, where agents searched CS-3 for contraband, with none found, with the exception of a small Ziploc-style baggie containing approximately 0.5 grams of suspect cocaine, which CS-3 indicated FERNANDEZ had provided to CS-3.

33. According to CS-3, and as corroborated by CS-3's covert recording, once CS-3 entered FERNANDEZ's residence, FERNANDEZ immediately showed CS-3 a kilogram of suspect cocaine. FERNANDEZ then cut the kilogram open and allowed CS-3 to visually examine it. FERNANDEZ further provided CS-3 with a small sample of the cocaine for CS-3 to show to CS-3's customers. Agents reviewed CS-3's covert recording and observed the kilogram of suspect cocaine visible on the recording.

V. The Search Warrant & Arrest on May 27, 2021

34. On or about May 26, 2021, the Honorable Jeffrey T. Gilbert signed a warrant authorizing a search of the basement unit at 1735 N. 34th Ave. (FERNANDEZ's residence) under case number 21 M 325. On or about May 27, 2021, at approximately 7:30 a.m., law enforcement executed the warrant. Agents located FERNANDEZ and his wife inside the residence. Law enforcement placed FERNANDEZ under arrest and recovered Subject Phone 1 from his person.[10]

---

[10] Law enforcement identified the phone recovered from FERNANDEZ as Subject Phone 1 by placing a call to the number for Subject Phone 1 and observing the phone recovered from FERNANDEZ's person ring.

35. During the search of the residence, law enforcement recovered two brick-shaped objects wrapped in aluminum foil containing a white powdery substance from the rear storage room of the basement unit, weighing approximately 2.27 kilograms combined and containing suspect cocaine. Based on my training and experience, the texture, odor, and color are consistent with cocaine. Both brick-shaped objects have since been submitted to the DEA laboratory for chemical testing. Results are pending.

36. In the bedroom, in the dresser drawer, agents located three clear plastic baggies knotted at the top containing suspect cocaine, and an additional clear plastic Ziploc-style baggie that contained three small Ziploc-style baggies containing suspect cocaine. These baggies of suspect cocaine, weighing approximately 91.3 grams combined, have also been submitted for testing to DEA labs.

## Conclusion

37. Based on the foregoing, I believe there is probable cause to believe that, on or about May 27, 2021, ALBERTO FERNANDEZ knowingly and intentionally possessed with intent to distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_Hailey Evans_
HAILEY EVANS

Task Force Officer, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone May 27, 2021.

_____
Honorable GABRIEL A. FUENTES
United States Magistrate Judge