AO 106 (REV. 4/10) Application for a Search
Warrant



AUSA Megan DeMarco, (312) 312-3535
AUSA Andrew J. Dixon, (312) 371-4231

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case Number:  21 CR 351

The cellular telephone, further described in
Attachment A

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Artyom Postupaka, a Special Agent of the Drug Enforcement Administration, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence and instrumentalities.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 and 846 | conspiracy to possess with intent to distribute narcotics |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

/s/ Artyom Postupaka (w/ permission BWJ)
_____
*Applicant's Signature*

ARTYOM POSTUPAKA, Special Agent
Drug Enforcement Administration
_____
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date:  June 4, 2021

*Judge's signature*

City and State: Chicago, Illinois

BETH W. JANTZ, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT          )
                                      )
NORTHERN DISTRICT OF ILLINOIS         )

## AFFIDAVIT

I, Artyom Postupaka, being duly sworn, state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration and have been so employed since approximately September of 2018. From September of 2012 to September of 2018, I was employed as a Police Officer with the Village of Lisle Police Department. I was assigned as a Task Force Officer to the DEA from July of 2014 to August of 2018. I am currently assigned to the DEA Chicago Field Division, and my responsibilities include the investigation of narcotics trafficking offenses.

2.      As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, and 846. I have participated in numerous investigations involving a variety of investigative techniques, including physical and electronic surveillance methods; controlled purchases and deliveries of narcotics; the analysis of a wide variety of records and data, including pen register and trap and trace data as well as cell phone location data; and the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. In addition, I have received specialized training in Title III investigations and have participated in

several Title III investigations as a case agent, co-case agent, monitor, and surveillance agent.

3.    I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.    I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.    This affidavit is made in support of an application for a warrant to search a black Apple iPhone Model A1778 cellular telephone bearing serial number BCG-E3091A (**Subject Phone 1**), for evidence and instrumentalities described further in Attachment B, concerning narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846.

6. The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, are located within **Subject Phone 1**.

## I. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONE

### A. Background

7. On or about May 27, 2021, law enforcement arrested Alberto FERNANDEZ following a court-authorized search of FERNANDEZ's residence, which resulted in the recovery of approximately 2.27 kilograms of suspect cocaine.[1] During the arrest, law enforcement recovered **Subject Phone 1** from on FERNANDEZ's person. As explained below, in the week leading up to his arrest, FERNANDEZ used **Subject Phone 1** to coordinate a narcotics transaction with an

---

[1] See paragraph 35 below.

3

individual who, unbeknownst to FERNANDEZ, was a DEA confidential source ("CS-3"). [2]

8.     Since approximately May 2021, law enforcement has been investigating FERNANDEZ for narcotics trafficking offenses. On or about May 20, 2021, law enforcement received information from CS-3 regarding a possible source of supply for cocaine. Per CS-3's information, CS-3 knew of a subject using the alias "Pajaro" selling kilograms of cocaine. CS-3 showed agents Pajaro's Facebook profile from the Facebook application on CS-3's cell phone. The profile included a picture, and the name attached to the profile was Alberto FERNANDEZ. Agents have since identified "Pajaro" to be Alberto FERNANDEZ.[3] According to CS-3, FERNANDEZ is a kilogram-level cocaine trafficker based out of Stone Park, Illinois and deals largely in the Chicagoland area. CS-3 related that, since 2017, CS-3 has purchased cocaine from FERNANDEZ almost every week. Each time, CS-3 bought anywhere from half a kilogram to three kilograms of cocaine from FERNANDEZ. CS-3 related that FERNANDEZ's cocaine is driven up to Illinois from Texas.

---

[2] CS-3 has criminal convictions for narcotics offenses and arson. Law enforcement arrested CS-3 for a narcotics offense at approximately 6 a.m. on May 20, 2021, and CS-3 began cooperating the same day, shortly after CS-3's arrest. CS-3 is currently cooperating in hopes of receiving a more lenient sentence for that offense, although law enforcement has not made CS-3 any promises as to what CS-3's ultimate sentence may be. Law enforcement considers CS-3 to be a reliable source of information. The information CS-3 provided was corroborated by the May 20 controlled buy and other information learned through law enforcement investigation.

[3] CS-3 identified FERNANDEZ from a known Illinois Driver's License photograph of Alberto FERNANDEZ.

### B. The May 20 Controlled Buy

9. On or about May 20, at approximately 9:49 a.m., FERNANDEZ sent a WhatsApp message from **Subject Phone 1** which stated, "How are you? I'm at work. They [narcotics suppliers] told me that they are ready in two days. Let's see if that is true." CS-3 replied, "Fuck. How? Did they need something [what is the delay]?" FERNANDEZ replied, "That he was barely in Texas [the driver wasn't far into the drive from Mexico]." CS-3 asked, "Do you have the cheap kind [cocaine mixed with cutting agents]?" FERNANDEZ answered, "Yes, I have some basketballs [ounces] here." CS-3 replied, "Approximately how many? And how much? I just need something small. I'm dry [out of cocaine]." FERNANDEZ replied, "I can do 5 or 6 [ounces]. The thing is I'm working with another guy. And I can only leave them at 1250 [$1,250 per ounce]."

10. CS-3 then sent an audio message via WhatsApp to **Subject Phone 1** stating, "Listen bro, I need … It's not for me, It's for my friend. I'll let you know how many he needs. You can't leave it at 12 [you can't sell it to me at $1,200 per ounce]?" FERNANDEZ, using **Subject Phone 1**, replied, "If I lower it. It'll be my pay [FERNANDEZ will not make a profit]. It's the one you opened [it's an ounce from the same kilogram of cocaine CS-3 had already purchased from]. It's not bad. It's good [good quality cocaine]." CS-3 replied, "My friend wants three [ounces]. I'll arrive around 12 [12:00 p.m.]. What do you think?" FERNANDEZ, using **Subject Phone 1**, messaged, "Shit. I won't make it. I leave at until 6 [6:00 p.m.]."

5

11.     Between approximately 2:34 p.m. and 4:36 p.m., CS-3 and FERNANDEZ, using **Subject Phone 1**, communicated via WhatsApp about the upcoming cocaine purchase. FERNANDEZ sent a WhatsApp message to CS-3 stating, "Looks like I'm going to get there earlier bro. Like in an hour." CS-3 replied, "Let me ask him. I had already told him at that time bro." FERNANDEZ replied, "Okay. How ever you see fit. I'm ready at whatever time." CS-3 messaged, "Let me call him [the fictitious customer]." FERNANDEZ replied, "Ok. I am just getting here." CS-3 stated, "Ok I'll let you know when I get there. He just said two [two ounces] bro." FERNANDEZ replied, "That's fine. The other guys are going to take longer. I think that they ran out again." CS-3 asked, "Really? Until when?" FERNANDEZ replied, "Supposedly, it was in the next couple of days and I asked someone else and they said longer. When you get here, I'll tell you about it." CS-3 replied, "Ok bro."

12.     At approximately 6:15 p.m., FERNANDEZ, using **Subject Phone 1**, sent a WhatsApp message to CS-3 stating, "Hey, I'm here already." CS-3 replied, "He's almost here. I'll let you know when he's closer."

13.     At approximately 6:24 p.m., surveillance was established in the area of 1735 N. 34th Avenue, Stone Park, Illinois. CS-3 had previously identified this location to be FERNANDEZ's residence. CS-3 had been to the residence multiple times before.[4]

---

[4] According to law enforcement records, FERNANDEZ's driver's license reflects that his residence is 1735 N. 34th Ave., Stone Park, Illinois. Further, open-source utility bills reflect that FERNANDEZ resides in the basement unit.

14.     At approximately the same time, agents met with CS-3 at a predetermined location. At this time, agents searched CS-3 and CS-3's vehicle for any contraband and/or excess money. CS-3 had additional cash, which agents held during the deal and returned to CS-3 after the deal was completed. No contraband was located on CS-3 or inside CS-3's vehicle. Agents provided CS-3 with approximately $2,500. Further, CS-3 was wired with an audio/video recording device and a live-audio transmitting device.[5]

15.     At approximately 6:27 p.m., CS-3 sent a WhatsApp message to FERNANDEZ, at **Subject Phone 1**, stating, "I'll be there in ten minutes." FERNANDEZ replied, "Ok."

16.     At approximately 6:35 p.m., agents followed CS-3 in CS-3's vehicle as CS-3 left the brief location. Agents maintained constant surveillance of CS-3 and CS-3's vehicle.

17.     At approximately 6:48 p.m., surveillance units observed CS-3's vehicle pull onto FERNANDEZ's block and park on the street in front of 1735 N. 34th Ave. At this time, CS-3 placed a recorded call to FERNANDEZ, at **Subject Phone 1**, letting FERNANDEZ know that CS-3 was outside.

18.     At approximately 6:49 p.m., surveillance units observed CS-3 exit the vehicle, walk toward 1735 N. 34th Ave., and enter the front door.

---

[5] The video recording device malfunctioned during the deal with FERNANDEZ, so only audio from the deal was captured.

19.     As heard on the covert recording, FERNANDEZ said, "This doesn't have much [not a full ounce]. It's open." CS-3 responded, "There you go, that one [a full ounce]. FERNANDEZ replied, "Look." CS-3 replied, "Yes." FERNANDEZ said, "About the parts [kilograms of cocaine]. The guy from over there … (Unintelligible) The guy [source of supply] that has them here … (Unintelligible) they're going to let them through. This week, the guy that usually comes to get the junk [low quality narcotics] … I talked to him. He [source of supply] told me that his boss is stuck, if I had any others. He wants the same ones. The H-H [source of supply]. That one's hard [low quality]. The boss has it stuck and that it will be on his way Thursday or Friday." CS-3 asked, "This week?" FERNANDEZ answered, "And I called him and asked him what's going on. They had told me that it would be this week. That it'll be until Sunday or until next Sunday. They had told me Thursday or Friday. They changed it. They have it [narcotics] but they're storing it. This guy, since two weeks, has not wanted to give it to me. (Unintelligible) … Two blocks away from here and from there they take it. (Unintelligible) Since he's on his way, he should bring another 5 [kilograms of narcotics]. He said that it wasn't necessary. And like that we waited for him but because we did not have a choice." CS-3 replied, "Damn. (Unintelligible)." FERNANDEZ stated, "(Unintelligible) The guy's number [price] remains the same, it's similar. (Unintelligible) The reality is that you guys work (Unintelligible) If you want to bring them." CS-3 replied, "At least to see them." FERNANDEZ replied, "I don't like it when they go back. But he said that's how it is. But I know it's not right.

It looks about the same and I know it's okay. So that's how I was asking for it because the other guy, he wants some too. He told me that if I bring him the same ones, five of them, I'll get some … and I'll bring you enough for the five [quantity of narcotics]. He said that he could pay (Unintelligible) but at least he'll try to pay the entire five. I told him I'd let him know as soon as they arrive." CS-3 replied, "Well, let me know." FERNANDEZ replied, "This guy [different source of supply] is going to bring me some [narcotics]. It's not the same but it's similar [not the same source but the narcotics have a similar quality]. I believe it's something in between (Unintelligible) and this one." CS-3's reply was unintelligible. FERNANDEZ stated, "If it arrives, I'll let you know. The number [price] I'm going to leave it the same because I don't think they will lower it. (Unintelligible) From this Sunday until next Sunday (Unintelligible). The price is worth it but it's not how it used to be [quality of narcotics is not the same] (Unintelligible). The guy says it's bad ass but it takes forever for it to arrive. He didn't gain a lot of profit because when he arrived it was still a good price. But it dropped." CS-3 replied, "Well, thank you. (Unintelligible)." FERNANDEZ stated something unintelligibly and CS-3 stated, "Okay, we're set. Let me know if anything."

20.     Based on my training and experience and the training and experience of other law enforcement officers involved in the investigation, during this conversation, FERNANDEZ advised CS-3 that FERNANDEZ's narcotics supplier was sending another shipment of narcotics to FERNANDEZ, scheduled to arrive around May 27 or 28, 2021. FERNANDEZ related that the price per kilogram of cocaine would be

similar to what CS-3 had paid in the past. FERNANDEZ further advised that CS-3 could come and see the narcotics once they arrived. FERNANDEZ further advised CS-3 that FERNANDEZ had another customer who wanted to purchase five kilograms of narcotics, and that FERNANDEZ would tell him/her as well when the narcotics arrived. Lastly, FERNANDEZ advised CS-3 that FERNANDEZ had another narcotics supplier who had narcotics for sale, but that the quality was different from that of the primary source of supply.

21.    At approximately 6:55 p.m., surveillance units observed CS-3 exit the front door of 1735 N. 34th Ave., get back into the driver's seat of CS-3's vehicle, and depart the block.

22.    At approximately the same time, agents followed CS-3's vehicle out of the area and to a predetermined debrief location.

23.    At approximately 7:00 p.m., agents met with and debriefed CS-3. CS-3 related the following, not verbatim. CS-3 walked into the front door of 1735 N. 34th Avenue, turned slightly to the right, and walked downstairs to FERNANDEZ's basement unit. According to CS-3 and as captured on the video/audio recording device, CS-3 and FERNANDEZ began talking about a shipment of kilograms of cocaine that was supposedly coming to FERNANDEZ. CS-3 related that FERNANDEZ then retrieved two clear plastic baggies knotted at the top containing a white chunky/powdery substance, suspect cocaine. According to CS-3, FERNANDEZ weighed both baggies in front of CS-3 and stated that one was short.

10

CS-3 related that FERNANDEZ then retrieved a different clear plastic baggie knotted at the top containing a white chunky/powdery substance (suspect cocaine), weighed it, then gave both baggies to CS-3. CS-3 gave FERNANDEZ $2,500 in exchange. CS-3 then left the basement unit and returned to CS-3's vehicle.

24.    At the same time, agents collected from CS-3 two clear plastic baggies knotted at the top, containing a white chunky/powdery substance, suspect cocaine. Based on agents' training and experience, agents believed the substance to be cocaine because it appeared like, smelled like, and had the texture of cocaine.[6] Agents have since submitted the suspect cocaine sold by FERNANDEZ to the DEA laboratory for chemical testing. Results are pending.

### C.    Receipt of a Cocaine Sample from FERNANDEZ on May 26, 2021

25.    On or about May 24, 2021, at approximately 8:49 p.m., CS-3 sent a WhatsApp message to FERNANDEZ, at **Subject Phone 1**, asking, "What's up. Is there any of the new stuff [narcotics] available?" At approximately 9:28 p.m., FERNANDEZ, using **Subject Phone 1**, replied, "Let me call them [the source of supply] tomorrow." CS-3 replied, "Let me know bro."

26.    On or about May 25, 2021, at approximately 9:31 a.m., CS-3 sent a WhatsApp message to FERNANDEZ at **Subject Phone 1**, asking, "What's up bro?"

---

[6] Further, as described herein, it was CS-3's understanding that he believed he was meeting FERNANDEZ to buy cocaine, based on CS-3's years-long history of purchasing cocaine from FERNANDEZ.

27.     At approximately 10:17 a.m., FERNANDEZ replied, using **Subject Phone 1**, "They [source of supply] haven't answered me yet." CS-3 replied, "Don't you think they're just fronting [acting like they have narcotics; putting on a show]? It's been two weeks." FERNANDEZ replied, "Maybe. They would've brought them by now." CS-3 replied, "Let me know."

28.     At approximately 6:08 p.m., CS-3 had an unrecorded WhatsApp Phone conversation with FERNANDEZ, who was using **Subject Phone 1**.[7] CS-3 advised agents that, during this call, FERNANDEZ stated that FERNANDEZ had just obtained cocaine and wanted to show it to CS-3; if CS-3 liked the cocaine, then CS-3 could purchase it from FERNANDEZ. FERNANDEZ advised CS-3 to come over to 1735 N. 34th Ave on May 26, 2021 to look at the narcotics.

29.     During the course of the day on or about May 26, 2021, CS-3 exchanged a series of WhatsApp communications with FERNANDEZ, at **Subject Phone 1**, regarding a planned narcotics transaction. During these communications, FERNANDEZ advised CS-3 that CS-3 could come over to FERNANDEZ's residence to see a new shipment of cocaine.

30.     At approximately 5:11 p.m., agents initiated surveillance of FERNANDEZ's residence. Shortly thereafter, agents met with CS-3 and searched CS-3's person for contraband, with none found. CS-3 was equipped with audio/video

---

[7] FERNANDEZ called CS-3 unexpectedly and CS-3 was unable to record the phone call at that time.

recording equipment. CS-3 then travelled from the meet location to the area of FERNANDEZ's residence under constant surveillance.

31.     Surveillance observed CS-3 arrive in the area of FERNANDEZ's residence at approximately 5:42 p.m., park CS-3's vehicle, and enter FERNANDEZ's residence.

32.     At approximately 5:49 p.m., CS-3 exited FERNDANDEZ's residence, reentered CS-3's vehicle, and left the area.

33.     Shortly thereafter, CS-3 arrived in a predetermined meet location, where agents searched CS-3 for contraband, with none found, with the exception of a small Ziploc-style baggie containing approximately 0.5 grams of suspect cocaine, which CS-3 indicated FERNANDEZ had provided to CS-3.

34.     According to CS-3, and as corroborated by CS-3's covert recording, once CS-3 entered FERNANDEZ's residence, FERNANDEZ immediately showed CS-3 a kilogram of suspect cocaine. FERNANDEZ then cut the kilogram open and allowed CS-3 to visually examine it. FERNANDEZ further provided CS-3 with a small sample of the cocaine for CS-3 to show to CS-3's customers. Agents reviewed CS-3's covert recording and observed the kilogram of suspect cocaine visible on the recording.

### D.     The Search Warrant and Arrest

35.     On or about May 26, 2021, the Honorable Jeffrey T. Gilbert signed a warrant authorizing a search of the basement unit at 1735 N. 34th Ave. (FERNANDEZ's residence) under case number 21 M 325. On or about May 27, 2021,

at approximately 7:30 a.m., law enforcement executed the warrant. Agents located FERNANDEZ and his wife inside the residence.

36.     During the search of the residence, law enforcement recovered two brick-shaped objects wrapped in aluminum foil containing a white powdery substance from the rear storage room of the basement unit, weighing approximately 2.27 kilograms combined and containing suspect cocaine. Based on my training and experience, the texture, odor, and color are consistent with cocaine. Both brick-shaped objects have since been submitted to the DEA laboratory for chemical testing. Results are pending.

37.     In the bedroom, in the dresser drawer, agents located three clear plastic baggies knotted at the top containing suspect cocaine, and an additional clear plastic Ziploc-style baggie that contained three small Ziploc-style baggies containing suspect cocaine. These baggies of suspect cocaine, weighing approximately 91.3 grams combined, have also been submitted for testing to DEA labs.

**E.     The Recovery of Subject Phone 1**

38.     While executing the search warrant, law enforcement placed FERNANDEZ under arrest and recovered **Subject Phone 1** from his person. **Subject Phone 1** (pictured below) is a black Apple iPhone Model A1778 cellular telephone, bearing serial number BCG-E3091A:





15

39.     Law enforcement identified the phone recovered from FERNANDEZ as **Subject Phone 1** by placing a call to the number for **Subject Phone 1** and observing the phone recovered from FERNANDEZ's person ring as displayed below:



40.     Further, during post-arrest booking, FERNANDEZ provided officers with the number for **Subject Phone 1**, 708-351-2250, as his phone number. Since May 27, 2021, **Subject Phone 1** has been in the government's custody.

41.     At the time of arrest, data stored on **Subject Phone 1**, including text and voicemail messages sent and received by FERNANDEZ during the course of the commission of the narcotics offenses, were not known.

42.     Based upon my training and experience, I know that cellular phones may contain relevant evidence of narcotics offenses, including text messages made or received from a phone that are located in a phone's memory. Those messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the narcotics offenses. Moreover, digital photographs located in the memory of a phone may contain images of the tools or participants involved in the narcotics offenses, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

43.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contact

17

lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

44.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Based on my training and experience, I know that cell phone location information in the days leading up to a known transaction can reveal, among other things, evidence relating to the location of narcotics supplies, the identity of criminal associates, and the source and movement of narcotics. Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime) or consciousness of guilt (e.g., deleting communications to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a

program that deletes or overwrites the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

45.     Based upon my training and experience, I know that information maintained by cellular telephone providers may include records of calls made to and from the telephone number(s) associated with **Subject Phone 1**. As such, the cellular phone numbers and identities of the cellular telephone companies obtained from a search of **Subject Phone 1** would enable the government to obtain information from the cellular telephone companies revealing calls made to and from **Subject Phone 1** during the course of the commission of the narcotics offenses.

46.     Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, commonly use cellular telephones as a means to communicate. Individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators on their telephones, and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, **Subject Phone 1** is associated with the targets in this case, because there was telephonic communication between participants involved in the narcotics offenses, and because, in my experience and in the experience of other

19

agents, defendants use telephones to contact co-conspirators, there is probable cause to believe **Subject Phone 1**, described further in Attachment A, contains evidence of narcotics violations.

## II.  SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

47.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (e.g., computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer

20

experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

48.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

49.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

50.     As described in Attachment A, **Subject Phone 1** is an Apple brand device, specifically a black Apple iPhone Model A1778 cellular telephone, bearing serial number BCG-E3091A. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple,

that some models of Apple devices such as iPhones and iPads, including **Subject Phone 1**, offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

51.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints, either their own or others', that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

52.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include when more than 48 hours have passed since the last time the device was unlocked. The Touch ID feature will also not work and entry of a passcode will be required if the device's user or someone acting on the user's behalf has remotely locked the device. Thus, in the event law enforcement encounters a locked

22

Apple device, the opportunity to unlock the device via Touch ID, and execute the search authorized by the requested warrant, exists only for a short time (i.e., 48 hours or less, or until the device is given a remote lock command). Touch ID also will not work to unlock the device if the device has been turned off or restarted (e.g., if the device's battery becomes fully depleted), or after five unsuccessful attempts to unlock the device via Touch ID are made. In addition, I also know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offers users the ability to remotely erase the contents of such devices.

53.     The passcode or password that would unlock **Subject Phone 1** is unknown. Thus, it likely will be necessary to press the finger(s) of FERNANDEZ to the device's Touch ID sensor to unlock the device for purpose of executing the search authorized by this warrant.

54.     Attempting to unlock the relevant Apple devices via Touch ID with the use of the fingerprints of the user is necessary because the government may not otherwise be able to access or retrieve the data contained on those devices for the purpose of executing the search authorized by the requested warrant.

55.     Agents recovered the phone from FERNANDEZ's person, and FERNANDEZ identified the phone as his. Based on these facts and my training and

experience, it is likely that FERNANDEZ is the user of **Subject Phone 1** and thus that his fingerprints are among those that are able to unlock the device via Touch ID.

56.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers.[8] In the event that law enforcement is unable to unlock the **Subject Device** within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

57.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of FERNANDEZ to the Touch ID sensor of **Subject Phone 1** to attempt to unlock the device via Touch ID in order to search the contents as authorized by the requested warrant.

## III.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

58.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so

---

[8] Law enforcement will select the fingers to depress to the Touch ID sensor to avoid compelling the user of the device to disclose information about his knowledge of how to access the device.

that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

59. The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

     a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

     b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

     c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

60.    The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## IV. CONCLUSION

61.     Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846, have been committed, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in **Subject Phone 1**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for **Subject Phone 1** more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

/s/ Artyom Postupaka (w/permission BWJ)
_____
Artyom Postupaka
Special Agent
Drug Enforcement Administration

Sworn to and affirmed by telephone 4th day of June, 2021

_____
Honorable BETH W. JANTZ
United States Magistrate Judge

27

## <u>ATTACHMENT A</u>

## DESCRIPTION OF ITEM TO BE SEARCHED

A black Apple iPhone Model A1778 cellular telephone, bearing serial number BCG-E3091A (**Subject Phone 1**), with a blue circle attached to the back of the phone (pictured below).

 

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence and instrumentalities concerning violation of Title 21, United States Code, Sections 841(a) and 846, as follows:

1.　　All names, aliases, addresses, and telephone numbers, including the number associated with **Subject Phone 1** and any number directory stored in the memory of the phone, that provide information regarding the identities of suspected narcotics suppliers, couriers, customers, and other associates involved in narcotic trafficking.

2.　　Photographs, videos, or other electronic or digital images depicting narcotics, narcotics proceeds, suspected narcotics trafficking, narcotics trafficking associates, property acquired from the distribution of narcotics, or assets purchased with illegal proceeds.

3.　　Any communications with suppliers, workers, couriers, customers, coconspirators, and accomplices in narcotics trafficking activity, including text messages, email messages, SMS messages, picture messages, voicemails, communications over social media applications, contact lists and phonebooks, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, or records of appointments and/or reminders annotated on a calendar reflecting involvement in drug trafficking.

4.　　Evidence of who used, owned, or controlled the electronic storage device at the time the things described in this warrant were created, edited, or deleted, such

as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, user location data, email, email contacts, instant messaging logs, photographs, and correspondence.

5. Evidence indicating how and when the electronic storage device was accessed or used to determine the chronological context of electronic storage device access, use, and events relating to the crimes under investigation.

6. Location information concerning the whereabouts of the user of the electronic device and other associates involved in narcotics trafficking from May 15, 2021 through May 27, 2021, when the phone was seized.

7. Internet and search history relating to narcotics trafficking, and map history relating to narcotics trafficking from May 15, 2021 through May 27, 2021, when the phone was seized.

8. Passwords, encryption keys, and other access devices that may be necessary to access the electronic storage device.

9. Any SIM card located within **Subject Phone 1** that helps to identify any cellular telephone numbers associated with the phone.

10. Law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of FERNANDEZ onto the Touch ID sensor of **Subject Phone 1** to gain access to the contents of any such device.

2

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.